RUBIN KLEIN AND ABBEY S. KLEIN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Klein v. Commissioner
Docket Nos. 13844-79, 14157-79, 14161-79, 14164-79, 17504-79, 17505-79, 17543-79, 17544-79, 4338-80, 4340-80, 6091-80, 7393-80, 7394-80, 18517-80, 20687-80, 20688-80, 22197-81, 22204-81, 25759-81, 25843-81, 29103-81.
United States Tax Court
T.C. Memo 1986-521; 1986 Tax Ct. Memo LEXIS 84; 52 T.C.M. (CCH) 853; T.C.M. (RIA) 86521; October 21, 1986. *84 Held: The waivers of the statute of limitations on assessment and collection of Ps' Federal income taxes, Forms 872 and 872-A, executed by the parties are valid. Ps' arguments that the waivers are invalid because of misrepresentation, institutional misconduct, R's administrative practice relating to extensions for filing tax returns and, in the case of the Forms 872-A, R's failure to provide settlement negotiations are rejected. Charles L. Ruffner and Jerome J. Caplan, for the petitioners. David R. Smith and W. Preston White, Jr., for the respondent. CANTREL
MEMORANDUM FINDINGS OF FACT AND OPINION CANTREL, Special Trial Judge:[2] Respondent determined the following deficiencies in petitioners' Federal income tax: Docket No.
Petitioners [3]
Year Ending
Deficiency
13844-79
Rubin Klein and Abbey S. Klein
1975
$45,811
1976
23,098
14157-79
Edward Hersh and Najla Hersh
1975
14,765
14161-79
Jeffrey A. Diamond and Maria
1975
25,916
Diamond
1976
14,801
14164-79
Bertram J. Frankel and
1974
14,123
Harriet Frankel
1975
21,816
17504-79
N. Ralph Frankel and
1974
18,265
Diane Frankel
1975
19,496
1976
3,695
25843-81
N. Ralph Frankel and
1977
2,114
Diane Frankel
1978
1,992
17505-79
Howard Fuerst and Sheila Fuerst
1975
27,136
1976
17,578
17543-79
Robert Pomerantz and Ellen
1975
29,854
Pomerantz
1976
15,311
17544-79
Robert Josell and Selma Josell
1975
60,972
1976
33,206
4338-80
Raymond P. Nolan and
1975
20,077
Mildred Nolan
1976
15,010
4340-80
Arthur I. Feinberg and
1975
25,497
Lois H. Feinberg
1976
19,234
6091-80
Sam Strum and Lynn Strum
1975
28,102
1976
12,372
7393-80
Charles K. Hepner and
1975
58,768
Rhoda Hepner
7394-80
Arthur S. Rubin and
1975
12,792
Wendy S. Rubin
1976
7,788
18517-80
Estate of H. Loy Anderson,
1975
55,834
Deceased, Bessemer Trust
Company of Florida and H.
Loy Anderson, Jr., Co-
Personal Representatives,
and Estate of Therese A.
Anderson, Deceased, Andrea
A. Hersey, Personal Repre-
sentative
20687-80
Stoyan P. Rosenthal and
1975
28,903
Tobene M. Rosenthal
20688-80
Ted M. Avellone and June Avellone
1975
53,041
1976
22,074
22197-81
Eugene Mascarenhas and
1977
25,669
Lalita Mascarenhas
22204-81
James A. Gillis and Cathy Gillis
1977
22,872
1978
18,197
25759-81
D. Ralph Millard, Jr., and
1976
17,631
Barbara S. Millard
1977
1,042
1978
460
29103-81
Richard Leben and Mary L. Leben
1977
15,499
1978
10,647
1979
8,431
*85 These cases are before the Court for trial on the severed issues relating to the Forms 872 and 872-A, waivers of the statute of limitations on assessment and collection of tax, signed by *86 petitioners herein. If the waivers are not valid, the three-year statutory period for issuance of the notices of deficiency to petitioners for some of the years at issue would have expired prior to the date the notices were issued. [4] *87 Secs. 6213(a); [5] 6501(a). The parties agree that the notices of deficiency were timely issued absent a determination that the waivers are invalid. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. The following petitioners resided in Hollywood, Florida, when they filed their petitions: Rubin Klein and Abbey S. Klein; Edward Hersh and Najla Hersh; Jeffrey A. Diamond and Maria Diamond; Bertram J. Frankel and Harriet Frankel; Howard Fuerst and Sheila Fuerst; Robert Pomerantz and Ellen Pomerantz; Robert Josell and Selma Josell; Arthur I. Feinberg and Lois H. Feinberg; Sam Strum and Lynn Strum; Arthur S. Rubin and Wendy S. Rubin; Stoyan P. Rosenthal and Tobene M. Rosenthal; and Richard Leben and Mary L. Leben. Petitioners N. Ralph Frankel and Diane Frankel *88 resided in North Miami Beach, Florida, when they filed their petitions. Petitioners Raymond P. Nolan and Mildred Nolan resided in Davie, Florida, when they filed their petition. The following petitioners resided in Miami, Florida, when they filed their petitions: Charles K. Hepner and Rhoda Hepner; James A. Gillis and Cathy Gillis; D. Ralph Millard, Jr., and Barbara S. Millard. Petitioners Ted M. Avellone and June Avellone resided in Hallandale, Florida, when they filed their petition. Petitioners Eugene Mascarenhas and Lalita Mascarenhas resided in Plantation, Florida, when they filed their petition. There is no indication in the record of the situs of the probate of the Estate of H. Loy Anderson or the Estate of Therese A. Anderson or the legal residence of the estates' representatives. Nineteen of the 20 petitioners were investors in six limited partnerships organized by Kenneth J. Schwartz ("Schwartz"). In addition to the motion picture limited partnerships, Schwartz marketed investments in master recordings. Petitioners Eugene Mascarenhas, James A. Gillis and Richard Leben made investments in these master recordings. The motion picture limited partnerships in which petitioners *89 invested are as follows: D. Ralph Millard, Jr.
Emerald Hills Associates, Ltd. ("Emerald")
Richard Leben
N. Ralph Frankel
Hollywood Hills Associates, Ltd.
Bertram J. Frankel
("Hollywood")
Raymond P. Nolan
Sheridanview Properties Associates, Ltd.
Arthur I. Feinberg
("Sheridanview")
Howard Fuerst
Jeffrey A. Diamond
Oak Forest Associates, Ltd. ("Oak Forest")
James A. Gillis
Robert Josell
Sam Strum
Stoyan P. Rosenthal
Collegiate Properties Associates, Ltd.
H. Loy Anderson
("Collegiate")
Robert Pomerantz
Arthur S. Rubin
Charles K. Hepner
Edward Hersh
Sam Strum
Rubin Klein
Ted M. Avellone
D. Ralph Millard, Jr.
Columbia Hills Associates, Ltd.
H. Loy Anderson
("Columbia") Each of the partnerships acquired rights to distribute and exhibit a motion picture. The purchase price for the motion picture rights was, in all cases, paid in cash and a nonrecourse promissory note from the partnership. The ratio of the nonrecourse promissory notes to the cash payments ranged from six to one to seven to one. On November 15, 1973, the Commissioner of Internal Revenue publicly announced that a new program had been instituted by the Internal Revenue Service ("IRS") to facilitate the audit of the Federal income tax returns of taxpayers engaged *90 in oil and gas tax sheltered drilling funds. [6] The Tax Shelter Program provided for coordination between a project coordinator in the National Office of the IRS and Regional Offices of the IRS. By 1975 the Tax Shelter Program had been expanded to include audits of the Federal income tax returns of taxpayers engaged in motion picture activities, and by 1977 it included master recording activities. In February of 1976 the IRS issued a training manual, "Revenue Agent: Overview of Tax Shelters." The training manual contained the caveat that "[i]t should be kept in mind that a loss return, in and of itself, is not indicative of tax shelter 'ABUSE'." The training manual identified two types of motion picture tax shelters. The first type identified was a film purchase tax shelter where a syndicate of investors purchased a completed film for a cash downpayment and a nonrecourse note. The income from showing the film was divided among theatre owners, the distributor and, commonly, the producers *91 and stars of the film. The investors retained a "negative interest" which also included the right to a share of the gross receipts.Characteristics of a film purchase tax shelter which indicated potential tax issues were: (1) Purchase of film at an inflated value. (2) Nonrecourse note for 70 to 80 percent of purchase price. (3) Investment tax credit on investment. (4) Depreciation deduction based on the income forecast method, which uses the following formula: Purchase price times Currant year's income/Total estimated income equals Depreciation deduction (5) Classification of film as a capital asset or Code section 1231 property. This training manual was reprinted by Commerce Clearing House, Inc., on April 14, 1976. On February 9, 1976, the Audit Division at the IRS Jacksonville District (Jacksonville, Florida) was instructed not to approve the issuance of notices of deficiency where an issue relating to certain limited partnership tax shelters in film purchases was involved. These film purchase tax shelters, having the characteristics described in the training manual, were denominated as "negative pick-up" arrangements. The purpose for deferring the issuance of notices of deficiency *92 was to permit the Commissioner and the IRS National Office to develop a course of action to be taken in these cases. The IRS National Office issued M.S. 45G-260 [7] on May 20, 1976, which again instructed that no notices of deficiency should be issued in cases involving "negative pick-up" limited partnership arrangements. The Manual Supplement permitted the issuance of a notice of deficiency where the statute of limitations on assessment was close to expiration and the taxpayer would not sign a consent to the extention of the statutory period. On April 1, 1976, the District Director of the IRS Jacksonville District issued guidelines for Audit Division personnel having custody or possession of a tax return where "the statute of limitations is imminent or the normal statute of limitations appears to have expired." Primary responsibility for preventing expiration of the statute of limitations *93 was given to personnel having custody of the tax return. Included in the guidelines were instructions on obtaining consents. The instructions noted, in pertinent part: EXPIRATION DATE OF CONSENT
It is the policy of the Internal Revenue Service to secure consents only in cases involving unusual circumstances.The period of extension should be no longer than is necessary to complete the examination and other administrative action. The IRS National Office issued M.S. 42G-350 on June 24, 1976. The Manual Supplement provided revised guidelines and procedures for handling cases under the Tax Shelter Program and provided for coordination among the IRS National Office, Regional Offices, District Offices and Field Coordinators. The Assistant Regional Commissioner, Audit, in the IRS Midwest Region, was designated to control the motion picture tax shelter activities. Initial responsibility for identifying taxpayers to be included in the Tax Shelter Program was given to IRS District Offices and Field Coordinators. The Manual Supplement provided that the partnership authorized representative would have the benefit of appeals conferences at both the district and regional levels. [8] *94 The Jacksonville District Office of the IRS issued guidelines for examination of partnership returns with partners who resided within the Jacksonville District on November 1, 1976. The guidelines also provided for coordination where there were partners residing outside the district. The purpose of the guidelines was to provide uniformity in examination results for all partners in each partnership. On February 24, 1977, the IRS Office of the Chief Counsel issued Order No. 3330.4 which provided for uniformity in the administrative processing of cases where there were tax shelter partnership issues. The Order required coordination of restricted consents to extend the statute of limitations on assessment and collection by the offices of IRS Regional Counsel when a partnership had partners in districts serviced by other offices of Regional Counsel. In addition the Order provided for *95 coordination in the decision to issue notices of deficiency and the language to be used. On February 25, 1977, a memorandum was issued by the IRS Tax Court Litigation Division to all Regional Counsels and Branch Office Heads. This memorandum, in part, provided litigation guidelines for negative pick-up motion picture tax shelters. The guidelines set forth theories to be used in litigation of negative pick-up motion picture tax shelter issues and required coordination through the National Office. The memorandum also provided language to be used in notices of deficiency issued with respect to these shelters. Identical language for notices of deficiency issued in negative pick-up motion picture cases was provided in a memorandum dated March 18, 1977, to IRS Regional Commissioners, District Directors, and Chiefs, Appellate Branch Offices by the IRS Assistant Commissioner (Compliance). The memorandum also provided restricted consent language and cautioned that restricted consents to extend the statute of limitations on assessment and collection should only be used when the taxpayer refused to execute a general consent and the IRS Regional Counsel had approved the use of the restricted *96 consent. A copy of this memorandum was sent to IRS Regional Counsels and Branch Office Heads on March 21, 1977. The final paragraph of the transmittal memorandum states: In view of the potential flood of cases that could arise from a premature release of cases from suspense and the risk of bad cases going to Court first, the coordinator should be contacted before any notice is released. The transmittal memorandum received by Regional Counsel for the IRS Southeast Region contains this notation, "[n]ot being followed in SE." By News Release I.R. 1781, dated March 25, 1977, the IRS publicly announced the issuance of Rev. Rul. 77-110, 1977-1 C.B. 58. The Revenue Ruling stated the position of the IRS on the deductibility of depreciation and interest where a limited partnership negative pick-up motion picture shelter was at issue. The Revenue Ruling concluded that only the cash downpayment would be included in the depreciable basis of the motion picture and that no interest deduction would be permissible. The IRS Office of the Chief Counsel directed the release of "suspense" cases in the Tax Shelter Program by Order LEM 7033.1 dated April 1, 1977. A case which was in suspense was one *97 for which no action had been taken beyond the initial IRS examination pending development of the tax shelter issues. The rationale for release of these cases was that "[m]ost of the positions on the questions posed have been answered and Litigation Guidelines have been issued." Each IRS Regional Counsel's office was directed to select test cases for litigation. Investigative work on test cases selected was to be expedited and an attempt made to work with the partnership representatives to select test partners for litigation. The Order further provided: At such time, [on selection of a partnership and partners as test cases] the case will then proceed through the issuance of the 30-day letter with the opportunity of the taxpayer to protest to the Appellate Division if he so chooses. The Appellate Division will conference the cases in an expeditious manner. Appellate and Regional Counsel will determine whether a settlement shall be taken or the case continued to be processed as a test case. By memorandum dated April 13, 1977, the Audit Division of the IRS National Office informed all IRS Assistant Regional Commissioners (Audit) that the Audit Division was working with the IRS Office *98 of the Chief Counsel to identify the best partnership negative pick-up motion picture tax shelter cases for litigation. In order to facilitate selection, "check sheets" for all negative pick-up motion picture partnership tax shelter cases were to be prepared and ultimately submitted to the Assistant Regional Commissioner (Audit) in the IRS Midwest Region. The check sheets requested information regarding the partnership and the film, including financing, the appraised value of the film, the interest paid or accrued, management fees, the name of the film and the actors, the name of the distributors, and the earnings of the film. A proposed Manual Supplement was prepared describing the procedures to be used on the release of negative pick-up motion picture limited partnership tax shelter cases. The proposed Manual Supplement provided, in part: Section 3.Procedures
.05 Those partners selected as litigating cases should be so advised that their cases are identified as litigating cases. Those partners not having their returns identified as litigating cases should be advised that certain partners' returns from their partnership have been identified as litigating cases and until those *99 cases are resolved, their returns will be held in abeyance. The taxpayers whose cases are held in abeyance will be given the opportunity to have their cases reactivated if they agree to pay the applicable portion of the tax resulting from the adjustment proposed to the partnership return. Normal procedures will be used to inform all affected districts of the current status of the partnership and partner cases. .06 Taxpayers are entitled to normal administrative appeals procedures, but where the nature or complexity of the issues is such that original consideration by Appellate would be expected to result in a more effective and efficient handling of the case, a Preliminary Letter (30-day letter), L-191-B, should be issued. .07 It is anticipated that partnership cases identified as litigating vehicles where unresolved through normal administrative appeals procedures, will proceed to litigation before unresolved partnership cases not identified as litigating vehicles. These identified cases should receive priority in the appeals process and proceed in an expeditious manner with the granting of extensions to file protests held to a minimum. .08 In those instances where the partnership *100 return is not identified by Regional Counsel as a litigating vehicle, the case should be processed in the normal manner allowing all administrative appeal rights. The partnership's representative should be requested to select a sample number of partners' cases as a vehicle to resolve the partnership issues in Appellate. If a basis for agreement is reached, it should only be accepted if all partners will agree. .09 For any partnership in which the examination has not been concluded, and expiration of statutory periods for assessment are imminent on partners' returns, the examination should be concluded as soon as possible in order that an evaluation can be made as to whether there is a potential issue which can support the issuance of a statutory notice of deficiency. This is to preclude the issuance of statutory notices on undeveloped issues in partners' cases outside of the partnership district wherever possible. .10 Except in cases chosen for litigation, no statutory notices should be issued unless it is necessary to protect the Government's interests where the expiration of the statutory period for assessment is imminent and the taxpayer will not sign a consent. All statutory *101 notices to be issued in motion picture tax shelter cases must be reviewed by Regional Counsel prior to issuance. By memorandum dated May 20, 1977, a representative of the IRS Chief Counsel's office suggested that the Manual Supplement not be issued. This memorandum provided, in pertinent part: I imagine the foregoing, in general terms, can be immediately put into a manual supplement but I do not think it should. Such a supplement I understand goes on the Reading Room shelf and makes known to the world that anyone who is contacted in this area for the next few weeks could be an automatic "target" for litigation. The obvious reaction of competent tax counsel would be that partnerships not selected must be poor ones and it would be to the benefit of the partners and their tax counsel to have statutory notices issued to a number of those partners in order to assure that the Service is faced with poor litigating vehicles as well as the good ones. What I suggest is that we select our test cases from the checksheets and what information we already have about the partnerships and the motion picture involved, without the formal issuance of a manual supplement. At that point there will not *102 have been a general release of anything from suspense since we will be working on a selective case basis. Next, if a manual supplement is needed, it could be issued in the last week of June, to cover only the procedures to be followed in the selected cases and leave the release of the non-selected partnerships for a later manual supplement. * * * On August 24, 1977, a modification of the proposed, unissued Manual Supplement was released as M.S. 45G-287. The Manual Supplement issued provided for partial release of the negative pick-up limited partnership motion picture tax shelter cases. Unlike the proposed Manual Supplement, the Manual Supplement issued did not detail the different procedures to be used with litigating and nonlitigating vehicle cases. The Manual Supplement did indicate that where, on review, the "case indicates it would not be a good litigating vehicle, normal settlement procedures will be used." The Tax Court Litigation Division of the IRS Office of the Chief Counsel issued the initial list of negative pick-up motion picture limited partnership tax shelters to be released sometime prior to July 15, 1977. This information was given to all IRS Assistant Regional *103 Commissioners (Audit) by memorandum dated July 15, 1977. The memorandum instructed that the district assigned the partnership return should select three or four partners as litigating cases. All partners were to be notified that certain partners had been selected as litigating cases.Partners not selected as litigating cases were to be informed that their returns would be held in suspense unless they agreed to pay the tax liability resulting from the partnership adjustment. Partners selected as litigating cases were to receive 30-day letters entitling them to Appellate Division review upon completion of the examination and review and approval of the adjustments. Upon receipt of the case, the Appellate Division was to confer with the IRS Regional Counsel to determine that the case had been properly identified as a litigating case. Similar information was provided in M.S. 45G-287 issued on August 24, 1977. On the same date the Regional Counsel, IRS Southeast Region, submitted a memorandum to the District Director, IRS Jacksonville District, stating that the restricted consent language for negative pick-up limited partnership motion picture tax shelters previously approved should *104 continue to be followed and that general consents should be obtained when the taxpayer has invested in more than one type of tax shelter. This memorandum also stated the position of the IRS on amortization of organizational costs in negative pick-up motion picture tax shelters and amortization of copyright deductions in these shelters. The IRS Office of the Chief Counsel issued Order No. 3330.5 on November 7, 1977. This Order provided guidelines for processing of tax shelter partnership cases when some of the partners were currently involved in litigation and others were in the administrative process. The Order required coordination between the IRS Appellate Division and the IRS Office of the Chief Counsel in such instances. On December 12, 1977, M.S. 42G-376 was issued providing revised guidelines and procedures for handling cases under the Tax Shelter Program.Among the stated purposes of the Manual Supplement was to provide for uniform treatment of all investors. As with earlier manual supplements, the guidelines included provisions for coordination among the IRS National Office, Regional Offices, and District Offices. The Manual Supplement also provided that tax shelter cases *105 would receive the benefit of IRS district and Appellate Division review. In addition the Manual Supplement enumerated factors which were to be considered in case selection. Further the Manual Supplement provided procedures for control and development of cases in the Tax Shelter Program. The anticipated litigation of tax shelter suspense cases on which no action had previously been taken was announced by an IRS News Release. The News Release detailed the remarks of the Commissioner of the IRS on May 24, 1977, before the American Institute of Certified Public Accountants, Los Angeles, California. This News Release stated, in pertinent part: To remedy this [tax shelter abuse] the service simply must have an effective means of dealing with the identification, audit and selection for litigation of those returns which utilize what might be called abusive tax shelter techniques, let me tell you what our procedures have been to date, what problems we have encountered and how we are moving to correct and improve the situation. * * * The service's current coordinated tax shelter program, a multifunctional task force approach, was designed as a limited examination program with a plan to examine *106 less than 100 partnerships nationwide in each of four identified tax shelters areas. This program involved a closely coordinated national office effort to identify abusive tax shelter arrangements, to develop a service position on key issues and to mark cases for early litigation. We now believe that the present coordinated Tax Shelter Program has served its purpose. The announcement of an official service position with regard to many key abusive tax shelter issues and the new 1976 Act legislation which brings more objective rules to many shelter areas, make it appropriate for the service to now place the audit of partnership returns back into the regular return examination program. * * * We do not believe, therefore, that any form of National Office identification of specific cases will continue to serve a constructive purpose.Instead, each Assistant Regional Commissioner (Audit) will be requested to assign a program analyst to the Tax Shelter Program. The analyst will be responsible for coordination of Tax Shelter matters with the National Office Audit Division, District Offices, the Regional Appellate Office, Regional Counsel, and with his or her counterpart in other regions.In *107 short, we believe that the Tax Shelter workload will flow most effectively and with the greatest priority and coordination by using the existing field organization. * * * Another of the difficulties involved in the existing [Tax Shelter] program has been that it leads to a large number of cases being held in suspense for an extended period. Suspense action is usually taken pending the issuance of a revenue ruling, the adoption of a legal position, the outcome of litigation, or the receipt of other instructions, primarily technical advice, from the National Office. Not only does such an approach cause consent problems of major proportions but when the suspense issue is resolved -- with the possibility that a glut of cases is released from suspense at the same time -- the Service faces the prospect of a significant increase of individual tax audits in districts throughout the country and the possibility of judicial review of these cases could not only serve to deny to the Service the right to select for litigation those cases which it feels would best serve the development of law but could, also, considerably overburden the courts. For these reasons the cases which are currently in *108 suspense must be released in an orderly fashion.Cases involving a large number of partners will be resolved by the use of selected "pattern cases" during the appeals process, leaving the remaining partners in audit suspense until the case is resolved. Since uniform and consistent treatment of similar issues is regarded by the Service as essential, the Appellate Division is developing a centralized office concept in which the Director of the Appellate Division in the National Office will designate certain Appellate Field Offices to have control over Appellate "controlled issues" or Appellate "coordinated issues" -- both of which have as their objective the uniform treatment of taxpayers. Under this approach, no Appellate "controlled issue" will be conceded, or settled or otherwise disposed of without the approval of the Appellate office in which settlement jurisdiction and control is designated by the Director. Appellate "coordinated issues" will similarly be treated except that settlement authority will not be transferred. In the case of "coordinated" cases, the designated coordinating Appellate office will provide appropriate advice, guidance and assistance to the Appellate *109 office having jurisdiction over the case. [Emphasis added; Reproduced literally.] A less comprehensive IRS News Release detailing the remarks of the Commissioner of the IRS on October 26, 1977, to the 30th Annual Federal Tax Conference, the University of Chicago Law School, was issued. This News Release stated, in pertinent part: One problem in examining these partnership returns, particularly those with many hundreds of investors, is the requirement of holding a large number of partners' returns in suspense for long periods.Suspense action is usually taken to await the issuance of a revenue ruling, the adoption of a legal position, the outcome of litigation, or the receipt of other instructions, primarily technical advice, from the National Office. * * * * * * The cases we now have in suspense are being released by processing a few representative ones through the appeals system with those remaining cases being held until the others are resolved. Our objective controlling the release of these cases is to insure uniform and consistent treatment of similar issues in all cases. The text of the Commissioner's remarks on October 26, 1977, was also published in 55 Taxes 774 (December 1977). *110 In response to the Tax Shelter Program, the Commissioner of IRS approved changes in the posture of the IRS Appeals Office. These changes were communicated to the Regional Directors of Appeals by memorandum dated May 8, 1979. This memorandum provided, in part: The essence of the changes * * * is to reflect the balanced role of the Appeals Division in our tax administration system. While our key mission is to resolve tax controversies, we also play a vital role in enhancing voluntary compliance.This means that because of the overriding need to establish a point of law or to achieve uniformity and consistency in the treatment of taxpayers and issues there are times when we may decline to approve an otherwise acceptable settlement. The most noticeable example is the abusive tax shelter. It is important to recognize that this is a deviation from our traditional practice of complete independence and impartiality in settling cases based on hazards of litigation. We feel it is a necessary change, however, in order to effectively deal with the myriad of tax schemes and devices that have arisen in response to increasingly complex tax laws. Further, M.S. 82G-99 issued on June 14, 1979, provided *111 for "Appeals Coordinated Issues" where issues of widespread impact and importance were involved. Such issues included tax shelters. Taxpayers were to be notified when any issue was identified as an Appeals Coordinated Issue. Only the issue identified as an Appeals Coordinated Issue was to be processed in the prescribed manner. In a multi-issue case the Appeals Coordinated Issue could be "traded-off" and the taxpayer would be permitted conference rights. In April of 1979, the Southeast Region Tax Shelter Program was formed under the auspices of the Regional Counsel of the IRS Southeast Region. On April 11, 1979, a director of this program was appointed, and in November of 1979 coordinators at the District Counsel level were selected. Similar programs were mandated in other regions by the IRS Office of the Chief Counsel Order No. 3330.7. On May 26, 1980, the position of IRS National Tax Shelter Coordinator was announced to provide a "clearinghouse" for the regional programs. The stated objectives of the Southeast Region Tax Shelter Program were: (1) Regionally centralize the control and coordination of abusive tax shelter cases; (2) Identify and select abusive cases in each tax *112 shelter area for litigation on a prompt basis; (3) Reduce the inventory backlog in the Examination Division through trials of abusive tax shelter cases and through settlement of cases that have litigation hazards or a true basis of settlement; (4) Structure an orderly flow of cases to and through the judicial forum; and (5) Coordinates [sic] the flow of cases to the extent that special tax shelter calendars become implemented. To achieve these objectives, the Office of the Regional Counsel of the IRS Southeast Region instituted procedures at the District Counsel level relating to check sheets to identify cases which should be included within the program and drafted proposed language for restricted consents and notices of deficiency. Cases which were selected from the check sheets for litigation were denominated as "litigating vehicles." Once a case was slected as a litigating vehicle, the case file was to be marked to show that the case should not be settled but should be properly moved forward to trial. If, on issuance of the 30-day letter, the case was protested or answered, the Appeals Office was required to review the case on an expedited basis. Appeals Office jurisdiction was *113 to be limited in accordance with the following guidelines: 1. The Appeals Office was to retain jurisdiction for 30 days rather than the normal period; 2. The Appeals officer assigned the case was to contact the taxpayer or his representative to schedule a conference within 10 days of the assignment of the case to the Appeals officer; 3.The Appeals officer was to notify the taxpayer or his representative if there was no settlement possibility other than a full concession by the taxpayer. If additional information was proferred a second conference would be scheduled within 30 days; and 4. If no further information requiring consideration was produced, the case was to be immediately forwarded to District Counsel for trial preparation or issuance of the notice of deficiency. In addition a multidistrict control center was established to "track" each tax shelter case within the Southeast Region using the "war room" concept. [9] On July 12, 1979, the Office of the Regional Counsel, Southeast Region, instructed that 30-day letters issued in tax shelter cases selected as litigating vehicles were to contain special language informing the taxpayer that the case was to be "promptly litigated" *114 absent an agreement as to the tax shelter adjustments or submission of new evidence. A memorandum was issued by the IRS Jacksonville District on September 28, 1979, to provide guidelines for control of the statute of limitations where the expiration of the statute of limitations was imminent or where the normal statutory period appeared to have expired. The guidelines were directed to Examination Division [10] personnel having custody or possession of tax returns. The memorandum also provided guidelines for preparation of consents. The policy of the IRS on the solicitation of consents was stated as: EXPIRATION DATE OF CONSENT
It is the policy of the Internal Revenue Service to secure consents only in cases involving unusual circumstances. The period of extension should be no longer than is necessary to complete the examination and other administrative action. On January 31, 1980, M.S. 42G-404 was issued by the *115 IRS pertaining to coordinating and expediting cases in the Tax Shelter Program through the administrative appeals process. On the same date the IRS Office of the Chief Counsel issued Order No. 3330.7 pertaining to coordination of settlement and litigation of cases involving tax shelter issues in order to "expedite and coordinate the timely and consistent litigation or settlement of cases involving tax shelter issues." The Manual Supplement provided that a 30-day letter would be issued to investors in any promotion identified as a litigating vehicle. Except in situations where complex or substantive issues independent of the tax shelter issue existed, a special 30-day letter would be issued to the taxpayer. The Manual Supplement also provided for more extensive responsibility at the District Counsel level. In addition the Manual Supplement provided for reclassification of litigating vehicle cases for settlement where significant new facts or legal arguments were presented. Ultimately the IRS Southeast Region developed a system for coordination between an appointed District Counsel attorney and Examination Division and Appeals Office representatives. This coordination was intended *116 to facilitate screening check sheets to determine those cases which should be designated as litigating vehicles. The Assistant Regional Commissioner (Examination), IRS Southeast Region, issued Memorandum No. 42-37 pertaining to the Tax Shelter Program on February 8, 1980. This memorandum emphasized the objectives of the Southeast Region Tax Shelter Program as prompt identification, taxpayer contact, examination and litigation of abusive tax shelter schemes. The memorandum explained the procedures for internal recordkeeping, tracking and reporting of tax shelter returns. The memorandum also explained the check sheet procedure. A second similar memorandum was issued on June 23, 1981. On July 15, 1981, the IRS Office of the Chief Counsel issued Order No. 3330.11. The subject matter of this order related to valuation, summonses and lack of substantiation in tax shelter cases. The order cautioned that expert valuations and summonses should be used selectively in tax shelter cases. The order also directed that lack of substantiation be utilized as a ground for disallowance of losses and deductions where the taxpayer failed to provide information. A new procedure for processing cases *117 in the Tax Shelter Program was announced on August 19, 1981 by M.S. 42G-409. The Manual Supplement provided for two tax shelter classifications which required special handling or expedited processing. The classifications were Litigating Vehicle Issue and Settlement Vehicle Issue. A committee of designated representatives from each IRS District Director's Office, Appeals Office and District Counsel's Office was to be appointed to select cases for classification as Litigating Vehicle Issue cases or Settlement Vehicle Issue cases. Those cases so classified were to be subject to mandatory review by the Quality Review Staff. Once the classification was approved by the Quality Review Staff, the case would be expedited through the administrative process. In a Settlement Vehicle Issue case normal settlement procedures would be available.In a Litigating Vehicle Issue case a notice of deficiency was to be issued absent a full concession by the taxpayer or presentation of significant new facts or legal arguments. If significant new facts or legal arguments were presented, the case could be reclassified as a Settlement Vehicle Issue. On October 30, 1981, the IRS issued News Release IR-81-127 *118 which detailed a new policy in settlement of tax shelter cases. In this News Release three categories of tax shelters were described as regular cases, settlement vehicles and litigating vehicles. The IRS settlement posture in litigating vehicles was described as follows: Cases in the remaining category are called "litigating vehicles." These are shelter cases where the tax benefits have no basis in economic reality or where a legal precedent should be established. Since these cases usually involve ventures in which there's no profit motive, Examination disallows the full investment. In other words, what's often at stake isn't just the frivolous tax benefits, but also the taxpayer's actual, or "out of pocket" expenses. Under previous policies, Appeals has taken a very tough, "no settlement" stand in these litigating vehicle cases. Unless the taxpayer has been willing to concede in full or presents new facts or arguments, Appeals would issue a notice of deficiency. After that, the taxpayer's only recourse is to go to court. The purpose behind this no settlement stance was to build a penalty into the tax system. By not settling these cases, the theory was that the investor in an *119 abusive shelter would give up rather than face a court case and the interest on the deficiency. In August of 1983 Florida investors in what the IRS defined as abusive tax shelters were specifically notified of the possibility of "out of pocket" settlements. [11] The News Release stated that the number of litigating vehicle or no settlement cases was to be limited, and those cases currently classified as litigating vehicles were to be examined to ascertain if the classification was appropriate under the new guidelines. *120 Cases which were no longer appropriately classified as litigating vehicles under the new guidelines were to be reclassified as settlement vehicles and could be settled on the basis of "out of pocket" expenses. Revised guidelines for coordination, handling and control of tax shelter cases were provided by the IRS Office of Chief Counsel Order No. 3330.7A issued on November 19, 1981. The order provided that each IRS Regional Counsel was to appoint a Regional Tax Shelter Coordinator who was to assist in the general management, coordination and control of the Tax Shelter Program for the region and to act as a liaison to the National Tax Shelter Coordinator. The order also detailed pertinent existing procedures for handling tax shelter cases. As to settlement, the order provided: Settlement. Litigating Vehicle Issues may not be settled without prior coordination with the Key Case Attorney or special project attorney and approval by the National Tax Shelter Coordinator (coordinating with the Tax Litigation Division). Settlement Vehicle Issues and Regular Shelter Issues may be settled as appropriate under the circumstances and in conformance with existing guidelines and Technical Advice. *121 On the same date the IRS Office of Chief Counsel Order No. 3330.8A was issued providing revised guidelines for classifying tax shelter cases. On June 10, 1982, M.S. 42G-409 (Rev. 1) was issued. This Manual Supplement provided revised procedures for processing cases in the Tax Shelter Program. The basic change in the revised Manual Supplement was in limiting cases classified as Litigating Vehicles to "those cases with no litigating hazards [where] going to court is important to set precedent for the shelter in question or serious compliance problems will arise if the case is not litigated." The audits of the limited partnerships in which 19 of the 20 petitioners had invested began in 1976 and early 1977. These partnerships had the characteristics which the IRS described as "negative pick-up" arrangements. Initially, Andrew G. Callas or Charles R. Kelly ("Kelly"), Internal Revenue agents at the Miami, Florida office, contacted the partnership or Schwartz, a general partner in each partnership, requesting further information relating to the partnerships. Among the items requested were copies of the motion pictures involved in each partnership. The films were appraised and the appraisals *122 sent to the Internal Revenue agent. On December 20, 1976, and January 20, 1977, the partnership examinations assigned to Andrew G. Callas were transferred to Kelly. By March 2, 1977, Emerald, Hollywood, Sheridanview, Oak Forest and Columbia had been identified as cases under the Tax Shelter Program. Collegiate was added by June 10, 1977. Between May 3, 1977 and May 5, 1977, "check sheets" were prepared for each of these partnerships except Collegiate. The "check sheets" were reviewed by the IRS National Office. The National Office approved Emerald and Hollywood to be moved forward to litigation. The other partnerships were not identified as appropriate for litigation at that time. On June 20, 1977, the examinations of Emerald and Hollywood were selected to be terminated in order to move these cases forward to litigation. Kelly was informed of the selection of these cases to be moved forward to litigation on the same date. On July 15, 1977, the IRS National Office issued a memorandum which again identified Emerald and Hollywood as cases which were appropriate for litigation. The memorandum further stated that the partnership examination should be completed to ensure development *123 of the IRS technical position and three or four "clean" partners selected for litigation. The partners selected for litigation were to be so advised, and partners not selected for litigation were to be advised that other partners had been selected as litigating cases. The partners selected for litigation were to receive 30-day letters and priority processing at the Appellate Division level. Revenue Agents were instructed to obtain consents to the waiver of the statute of limitations for the cases which were not to be litigated. If a taxpayer refused to sign the consent, a notice of deficiency would be issued. On August 16, 1977, Kelly referred Schwartz to the IRS Intelligence Division for an investigation into potential criminal charges for aiding and abetting false reporting of Federal income tax. The referral was made on the basis of Schwartz's promotion and general partner activities in ten limited partnerships, including Emerald, Hollywood, Oak Forest and Collegiate. Two additional fraud referrals were made on January 4, 1979, and March 30, 1979. In each case investigation was declined. Kelly met with Barry Gurland ("Gurland"), the partnerships' representative. Gurland provided *124 Kelly with information requested, and Kelly reviewed this information during his examination. On January 5, 1978, Kelly held a closing conference for Hollywood. At the closing conference Kelly discussed the proposed adjustments with Gurland and Richard S. Cotler ("Cotler"), the attorney for Hollywood, and informed them that the case was unagreed. Kelly also informed them that Hollywood had been selected as a litigating case and explained that one or two partners' returns would be submitted along with Hollywood through the appeals process.Gurland and Cotler disputed the manner of closing the partnership case and requested that the administrative process continue at the partnership level alone. By March 3, 1978, Kelly had closed his examination on Hollywood, Sheridanview, Oak Forest and Collegiate. In each case a "test" partner had been selected by Kelly. These test partners were petitioners Howard Fuerst, N. Ralph Frankel, Robert Josell and Robert Pomerantz. For each of these partnerships Kelly prepared a Form 4665, Report Transmittal, which stated that the partnership was "a negative pick-up motion picture tax shelter, [that it] was selected by the National Office as one of the *125 litigation cases in the Southeast Region" and that the proposed adjustments had been discussed with IRS Regional Counsel. Each Report Transmittal identified a taxpayer with a related or key case. Normally, the Report Transmittal was not mailed to the taxpayer. On March 23 and March 24, 1978, 30-day letters were issued to Hollywood, Sheridanview, Oak Forest and Collegiate. The 30-day letters and their attachments did not identify the partnerships as subject to any administrative procedures other than those normally available. [12] In each case the general partner of general partners of each partnership wrote to the individual designated as the IRS contact person to request additional time in order to contact counsel and the limited partners. The examination of the partnerships was transferred to Carl Mosher ("Mosher") and Gary Krevat ("Krevat") *126 in March of 1978. Although the examination of four of the partnerships had been closed, the examinations of Emerald and Columbia were not closed until 1980. [13] In 1979 Mosher or Krevat made information requests relating to all six partnerships. On June 19, 1979, a conference was held with Gurland, Cotler, Schwartz and Lester Engel relating to the partnerships. Forms 4665, Report Transmittal, were prepared for Emerald and Columbia. Thirty-day letters were issued to Emerald and Columbia on September 24, 1980, and March 21, 1980, respectively. The 30-day letters contained no notation that the partnerships or the partners would not be subject to customary administrative procedures. In April of 1979 the IRS Southeast Region Tax Shelter Program was initiated.Under the auspices of that program a second set of check sheets were prepared to identify partnerships and individuals to be designated as litigating vehicles. A check sheet was prepared for each of the six partnerships in which petitioners invested. This procedure permitted a reevaluation *127 of partnerships which had previously been designated as litigating vehicles by the IRS National Office. The individual who was responsible for the selection of litigating vehicle cases was the same individual who was responsible for selection of such cases at the IRS National Office. By memoranda from the Regional Counsel, IRS Southeast Region, dated June 15, 1979, and June 27, 1979, Hollywood, Oak Forest and Collegiate were designated as litigating vehicles. Along with the partnerships, the memoranda identified petitioners Bertram J. Frankel, Jeffrey A. Diamond, Rubin Klein and Edward Hersh as desirable litigating vehicles. The memoranda suggested that the appeals process not be used, and notices of deficiency be issued. By memoranda from the Regional Counsel, IRS Southeast Region, dated February 28, 1980, and September 12, 1980, respectively, Columbia and Emerald were designated as litigating vehicles. Along with the partnerships, the memoranda identified petitioners H. Loy Anderson and D. Ralph Millard, Jr., as desirable litigating vehicles. The memoranda suggested that 30-day letters be issued to petitioners and recommended that the following language be used: The examination *128 has disclosed that adjustments to your returns are required because of the "tax shelter" promotion in which you were involved. Absent your agreement to these adjustments or the submission of new and additional evidence justifying further consideration, the Internal Revenue Service intends to promptly issue a statutory notice of deficiency and, if necessary, to promptly litigate any court case contesting the adjustments. Individual petitioner partners and their spouses received 30-day letters relating to the effects of the examinations as follows: Petitioner
Date
Howard Fuerst
March 23, 1978
N. Ralph Frankel
March 23, 1978
N. Ralph Frankel
April 10, 1981
Robert Josell
March 23, 1978
Robert Pomerantz
March 24, 1978
Arthur S. Rubin
October 1, 1979
Sam Strum
October 1, 1979
Arthur I. Feinberg
October 1, 1979
Charles K. Hepner
October 12, 1979
Raymond P. Nolan
October 25, 1979
H. Loy Anderson
March 21, 1980
Stoyan P. Rosenthal
April 1, 1980
Ted M. Avellone
April 1, 1980
D. Ralph Millard, Jr.
March 16, 1981
The 30-day letters issued on March 23 and 24, 1978, did not specifically identify the partnership or the taxpayer as a litigating vehicle. [14] Prior to the issuance of the 30-day letters, these petitioners were notified *129 by letter of proposed adjustments with respect to their partnership investment. The letter did not discuss any special procedures which would be in effect as a result of the partnership investment. However, the letters did advise those petitioners to contact the general partners or the partnerships' representatives for further information relating to the adjustments. The 30-day letters issued to Arthur S. Rubin, Stoyan P. Rosenthal, D. Ralph Millard, Jr., Sam Strum, Arthur I. Feinberg, Charles K. Hepner, H. Loy Anderson and Ted M. Avellone contained language similar to the recommended language in the Regional Counsel, Southeast Region, memoranda of February 28, 1980, and September 12, 1980. The 30-day letter issued to N. Ralph Frankel for the taxable year 1977 also contained this language. At the time of issuance of these 30-day letters, the *130 policy within the Jacksonville District of the Southeast Region was to send out 30-day letters within ten days of designation as litigating vehicles. The 30-day letter issued to Raymond P. Nolan did not notify the taxpayer that his partnership activities would receive special consideration. In fact Raymond P. Nolan was never designated as a litigating vehicle. No 30-day letters were issued to Rubin Klein, Bertram J. Frankel, Edward Hersh or Jeffrey A. Diamond. Instead they received a letter which stated that a notice of deficiency would be issued with respect to partnership loss deductions and that the partnership and the partners' cases would be litigated. On receipt of the 30-day letters dated March 23 and March 24, 1978, Howard Fuerst, N. Ralph Frankel, Robert Josell and Robert Pomerantz, with the assistance of Cotler, wrote to request an extension of time in which to file a protest. Extensions until late May of 1978 were granted in each case. A second extension was requested and granted for each petitioner.On July 14, 1978, Melvin E. Weinstein, an attorney practicing with Cotler, submitted protests for each petitioner. Between October 22, 1979 and April 21, 1981, Cotler submitted *131 protests for N. Ralph Frankel, Arthur S. Rubin, Sam Strum, Charles K. Hepner, Raymond P. Nolan, Stoyan P. Rosenthal and D. Ralph Millard, Jr. A protest for Ted M. Avellone was submitted on April 23, 1980, by Charles L. Ruffner, petitioners' counsel in this case. As a result of submission of their protests, District Conferences were scheduled for Howard Fuerst, N. Ralph Frankel, Robert Josell and Robert Pomerantz. The information given to the taxpayers with respect to the District Conference did not indicate that the taxpayers or the partnerships were litigating vehicles or would be subject to administrative procedures other than those normally available. The District Conferee assigned to these cases was John Mannion ("Mannion").Mannion reviewed copies of the Revenue Agent's Reports prior to the conference and was aware that the taxpayers and the partnerships in which they had invested were designated as litigating vehicles. The conference was held on December 11, 1978. Petitioners were represented by three attorneys, Cotler, Morris Engelberg and Melvin E. Weinstein. Petitioners' representatives were not informed that the partnerships or petitioners were litigating vehicles at *132 the conference. Mannion believed that he could have settled the cases for "out of pocket" expenses. However, he did not raise this possibility at the conference because Cotler insisted on an unacceptable basis of settlement. These conclusions were incorporated in Mannion's District Conference Report which characterized the case as "Unagreed -- To Appellate." Prior to Mannion's conference with petitioners' representatives, the District Conference division had ceased to exist and Mannion was actually assigned to the Appellate Division (renamed the Appeals Office). However, petitioners' representatives insisted that they receive a second conference at the Appellate Division. A second conference at the Appellate Division was scheduled on May 3, 1979. Present at the conference were Cotler, Morris Engelberg, Melvin E. Weinstein, Schwartz and Lester Engel (both of whom were general partners of Hollywood), Gurland and Appeals Officer Robert S. Weinreb ("Weinreb").At the conference Weinreb requested additional information relating to profit objective and petitioners' representatives were given 90 days to submit the additional information. Petitioners' representatives were aware of the *133 litigating vehicle designation of these cases at the time of the conference. With additional evidence supporting profit objective, the cases could possibly have been settled even though they had been designated as litigating vehicles. Petitioners' representatives did submit additional information to Weinreb.This information had previously been presented to Kelly at the examination stage. In late July or early August of 1979, Weinreb was directed to terminate settlement negotiations in these cases. Petitioners' representatives were informed that settlement negotiations were being terminated. Weinreb prepared an Appellate Division Transmittal Memorandum and Supporting Statement on September 13, 1979, directing that a notice of deficiency be issued to each of the petitioners.None of the other individual petitioner partners attended appellate conferences with respect to their partnership investments. Petitioners Eugene Mascarenhas, James A. Gillis and Richard Leben, whose tax liabilities were redetermined in whole or in part on the basis of their master recording investments, were notified of the pending examination of their Federal income tax returns on December 1, 1978, August 23, *134 1978, and September 19, 1979, respectively. After a review of check sheets prepared for Eugene Mascarenhas and James A. Gillis, the Regional Counsel for the IRS Southeast Region designated these petitioners as master recording litigating vehicles by memoranda dated February 9, 1981 and January 7, 1981, respectively. The memoranda suggested that 30-day letters be issued to these petitioners and recommended that the following language be used: The examination has disclosed that adjustments to your returns are required because of the "tax shelter" promotion in which you were involved. Absent your agreement to these adjustments or the submission of new and additional evidence justifying further consideration, the Internal Revenue Service intends to promptly issue a statutory notice of deficiency and, if necessary, to promptly litigate any court case contesting the adjustments. The 30-day letters issued to Eugene Mascarenhas and James A. Gillis on March 2, 1981 and January 26, 1981, respectively, contained language similar to the recommended language in the memoranda. Richard Leben received two 30-day letters issued on June 1, 1981, which also contained similar language. Protests were *135 submitted by Cotler on February 22, 1981, March 9, 1981, and June 19, 1981, respectively, for James A. Gillis, Eugene Mascarenhas and Richard Leben. Within a month of the date each protest was submitted, petitioners' representatives were notified that their cases fell within a category of cases which the Appeals Office would not settle unless substantial additional evidence was submitted. Petitioners were given 10 days to submit such additional evidence. The record does not disclose that any additional evidence which would permit settlement was presented. No conferences were ever held for these petitioners. During the period between initiation of the examinations and the conclusion of administrative proceedings, Forms 872 or 872-A, waivers of the statute of limitations, were solicited from petitioners. Waivers of the statute of limitations are normally solicited approximately seven months prior to the expiration of the statute of limitations to ensure completion of the administrative process. Generally, the transmittal letters initially mailed to petitioners or their representatives provided, in pertinent part: While considering your Federal tax return for the period shown above, *136 we found that the limitation period prescribed by law for assessing additional tax may expire soon. Unfortunately, more time is needed for us to consider all pertinent questions. * * * By extending the limitation period, you will have time, it you choose, to present your views at conferences at District and Regional levels if we propose adjustments you do not agree to. Later transmittal letters were substantially identical but did not contain a reference to District and Regional conferences. With the exception of two petitioners, no petitioners received any other correspondence relating to the waivers which would indicate that they would not receive normal administrative consideration.D. Ralph Millard, Jr., and Eugene Mascarenhas did receive letters dated February 26, 1980 and November 17, 1980, respectively, indicating that they would not receive normal administrative consideration on execution of waivers. Each letter provided, in pertinent part: It is important that you sign the consent, Form 872, for that tax year. As we explained earlier, we are currently examining the partnership or trust return identified above, and our records show that you were a member of the partnership *137 or trust in that year. If there are any adjustments to the partnership or trust return, your individual income tax return, Form 1040, will also be adjusted according to your pro rata share in the partnership or trust. In most cases the adjustment will result in additional tax. If so, we may have to immediately issue a notice of deficiency. If you sign the Form 872, however, we can wait for the result of any lawsuit before determining whether a notice of deficiency would be required. The waivers of the statute of limitations at issue here were executed by petitioners as follows: Date of
Petitioner
Year
Execution
N. Ralph Frankel
1974
1/20/78
N. Ralph Frankel
1975
10/21/78
N. Ralph Frankel
1977
2/23/81
Ted M. Avellone
1975
10/7/78
Ted M. Avellone
1976
2/13/80
H. Loy Anderson
1975
11/30/78
Bertram J. Frankel
1974
1/23/78
Bertram J. Frankel
1974
1/5/79
Bertram J. Frankel
1975
1/29/78
Jeffrey A. Diamond
1975
10/12/78
Arthur I. Feinberg
1975
11/15/78
Charles K. Hepner
1975
1/18/79
Edward Hersh
1975
10/24/78
Rubin Klein
1975
10/30/78
Raymond P. Nolan
1975
1/17/79
Arthur S. Rubin
1975
10/23/78
Stoyan P. Rosenthal
1975
10/23/78
Sam Strum
1975
1/2/79
Robert Pomerantz
1975
10/27/78
Robert Josell
1975
11/21/78
Howard Fuerst
1975
11/6/78
D. Ralph Millard, Jr.
1976
3/5/80
D. Ralph Millard, Jr.
1977
12/18/80
Eugene Mascarenhas
1977
11/21/80
Richard Leben
1977
12/5/80
James A. Gillis
1977
9/2/80
*138 Most of these waivers were restricted at Cotler's request to adjustments relating to carryover amounts from prior years' Federal income tax returns and redeterminations attributable to petitioners' tax shelter investments. The waivers executed by N. Ralph Frankel for 1977, Ted M. Avellone for 1976, D. Ralph Millard, Jr., Eugene Mascarenhas, Richard Leben, and James A. Gillis were on Forms 872-A. Each of these Forms provided, in pertinent part: (1) The amount(s) of any Federal income tax due on any return(s) made by or for the above taxpayer(s) for the period(s) ended [on the applicable period for each petitioner] may be assessed on or before the 90th (ninetieth) day after: (a) the Internal Revenue Service office considering the case receives Form 872-T, Notice of Termination of Special Consent to Extend the Time to Assess Tax, from the taxpayer(s); or (b) the Internal Revenue Service mails Form 872-T to the taxpayer(s); or (c) the Internal Revenue Service mails a notice of deficiency for such period(s); except that if a notice of deficiency is sent to the taxpayer(s), the time for assessing the tax for the period(s) stated in the notice of deficiency will end 60 days after the period *139 during which the making of an assessment was prohibited. A final adverse determination subject to declaratory judgment under sections 7428, 7476, or 7477 of the Internal Revenue Code will not terminate this agreement. None of the waivers executed by petitioners expressly required that any administrative proceedings be available to petitioners. On September 16, 1980, Cotler wrote to an IRS representative to request information relating to waivers being solicited from certain clients. Among the questions posited in this letter were: (2) Are the cases for which the Form 872-A are being requested designated as litigating cases? * * * (6) Are the Forms 872-A being requested solely to enable the Internal Revenue Service to have additional time to fully develop and process the Taxpayer's case? Cotler received a response by letter dated November 10, 1980. The answers which were given to Questions (2) and (6) were as follows: (2) Requesting the Form 872-A on a case does not designate it as a litigating case. * * * (6) In some cases this is true, and to allow the taxpayer to obtain his/her Appeal rights. In many instances, we obtain them for the reasons stated in the answer to question number *140 2. OPINION Petitioners assert that under the facts of these cases the waivers which they executed are invalid. In support of their assertion petitioners contend that contract principles apply to waivers of the statute of limitation and that their waivers are invalid as a result of misrepresentation by respondent. Petitioners also argue that the waivers should be disregarded because of respondent's institutional misconduct. In addition, petitioners argue that the waivers were void ab initio based on an IRS Private Letter Ruling relating to an extension request filed by a taxpayer under section 6081. Finally, petitioners argue that a waiver of the statute of limitations which is unlimited in time is void ab initio if settlement negotiations are not contemplated. [15] *141 Respondent maintains that the waivers are valid and that the absence of settlement negotiations does not vitiate the waivers. For the reasons discussed below, we agree with respondent. Section 6501(a) generally provides that the amount of any Federal income tax shall be assessed within 3 years after the date the Federal income tax return to which the tax related was filed. Section 6501(c)(4) provides an exception to the general rule where the parties agree that the tax may be assessed after the 3-year period. An agreement to extend the statute of limitations for assessment and collection of an income tax is not a contract but a unilateral waiver by the taxpayer of a defense. Piarulle v. Commissioner,80 T.C. 1035, 1042 (1983); Tallal v. Commissioner,77 T.C. 1291, 1294 (1981), affd. 778 F.2d 275 (5th Cir. 1985). However, contract principles are significant because section 6501(c)(4) requires that the parties reach a written agreement. Grunwald v. Commissioner,86 T.C. 85, 89 (1986); Piarulle v. Commissioner,supra at 1042. Essentially, a valid agreement under section 6501(c)(4) requires mutual assent but does not require consideration. Piarulle v. Commissioner,supra at 1042; Tallal v. Commissioner,supra at 1294. Here, there is no basis for a determination that mutual assent to the terms of the agreements *142 to extend the statute of limitations executed by petitioners is lacking. Petitioners do not claim that they did not intend to extend the statute of limitations nor do they claim that the periods of the extensions were different than contemplated by the parties. Instead, petitioners argue that there was no mutual assent because the IRS induced petitioners to extend the statute of limitations by offering further administrative proceedings which were, in fact, unavailable. Consequently, petitioners claim that they "did not receive what they bargained for, to wit, a fair and impartial administrative tribunal." [16] Initially, we note that petitioners were advised that they would not receive the normal *143 administrative consideration prior to execution of the waivers. D. Ralph Millard, Jr., and Eugene Mascarenhas received letters relating to the waivers informing them that related cases were being examined and that execution of the waivers would permit a determination in the related cases prior to issuance of notices of deficiency in their cases. Despite this warning both petitioners subsequently executed waivers. Clearly D. Ralph Millard, Jr., and Eugene Mascarenhas were not motivated to execute the waivers by any promises of administrative consideration. The other petitioners did not receive explicit written notification that normal administrative procedures would not be available. However, petitioners' representatives had been advised almost from the inception of the partnership audits that these cases would not be processed in the customary manner and we believe it unlikely that petitioners or their representatives did, in fact, expect to receive the normal administrative consideration. Although two of the petitioners herein testified that they would not have executed the waivers had they known their cases were "litigating vehicles," we found the testimony of these witnesses *144 to be self-serving and not credible. Cotler testified that he expected petitioners could settle their cases but reluctantly admitted that no such representations were made by any IRS employees. Cotler did not explain why, in light of all of the information publicly disseminated by the IRS relating to the Tax Shelter Program, that he purportedly was unaware that special consideration would be given to tax shelter investors such as petitioners herein. Prior to the execution of some of the waivers, Cotler had, in fact, written a letter to an IRS representative which indicated that he was knowledgeable about the special limitations applicable to examinations of tax shelter investors. Finally, Cotler admitted that in late 1979 he knew these cases could not be settled on the administrative level. Seven of the waivers involved herein were executed in 1980 and 1981, after Cotler admits he was aware that there would be no administrative settlements. Second, petitioners' argument requires that we determine that the agreements were not operative because there was a failure of consideration, i.e. , the bargained for exchange. In essence petitioners are arguing that the waivers were contracts *145 for which consideration was required.As a matter of law the waivers are not contracts, and we will not make a determination as to the efficacy of the waivers based on the failure of consideration. Third, the terms of the waivers themselves, many of which were restricted at the insistance of Cotler, do not mandate appellate consideration. While some of the transmittal letters did allude to the possibility of appellate consideration on the district or regional level, a requirement of appellate consideration was the embodied in the written agreement which manifested the parties' mutual assent. We view the transmittal letters as merely describing what the customary procedures were rather than reflecting additional terms to be incorporated in the waivers. [17]
Finally, in most instances the opportunity for appellate conferences was provided to petitioners. While the procedures utilized were different in scope from those customarily available to taxpayers, nonetheless the conferences were more than a perfunctory gesture since a presentation of new facts or legal arguments *146 could have resulted in reclassification of the cases so that settlements would have been possible on a basis other than full concession by the taxpayers. [18] Consequently, the statements pertaining to the availability of further conferences in the transmittal letters were not misleading. A related claim raised by petitioners is the existence of institutional misconduct on the part of the IRS for which petitioners assert the Court should prescribe a remedy likely to discourage such conduct in the future. The misconduct alleged by petitioners was the operation of the Tax Shelter Program through which special procedures were instituted to handle the administrative processing of their cases and others designated as litigating vehicles. The remedy requested by petitioners is a finding that the waivers executed by them were invalid. In support of their assertion petitioners primarily cite cases which deal with governmental misconduct in issuing summonses, obtaining grand jury information and obtaining evidence *147 in violation of Fourth Amendment protections. See, e.g., United States v. LaSalle National Bank,437 U.S. 298 (1978); United States v. Davis,636 F.2d 1028 (5th Cir. 1981); United States v. Tweel,550 F.2d 297 (5th Cir. 1977). Petitioners, by their argument, seek to elevate prohibitions which arose out of specific situations to a general rule of law. Petitioners have not cited nor has our research disclosed a single instance in which a general doctrine of institutional misconduct or bad faith has been applied in a situation analogous to that found in the instant cases. This Court has clearly stated that we normally will not examine respondent's motives or conduct in an administrative proceeding unless there is substantial evidence of unconstitutional conduct by respondent in determining the deficiency or there is a "naked" assessment. Graham v. Commissioner,82 T.C. 299, 308-309 (1984), affd. 770 F.2d 381 (3d Cir. 1985).Neither of these exceptions have been asserted or proved by petitioners, and we decline to determine whether respondent acted improperly in the conduct of the administrative proceedings. While not necessary to our determination, we believe it appropriate to comment *148 on respondent's conduct in instituting and operating a special program for administrative processing of Federal income tax returns of tax shelter investors. Our review of the record shows that the IRS made a reasonable effort to disclose the existence of special procedures applicable to tax shelter investors from the inception of the Tax Shelter Program. As the program evolved, specific guidelines were developed for tax shelter examinations. These guidelines were designed to insure uniform results in examinations. Our review of the record shows that the IRS endeavored to insure that tax shelter investors received fair and uniform treatment. While IRS personnel may have been reluctant to disclose their litigation strategy in these cases, this does not indicate any lack of fairness in instituting and conducting the Tax Shelter Program. Indeed, we believe that the unfairness of which petitioners complain is nothing more than the fact that their returns were identified as subject to review under the Tax Shelter Program prior to the expiration of the statute of limitations. This simply is not a ground for finding unfairness or misconduct. Petitioners' argument that we should find the *149 waivers void ab initio based on an IRS private letter ruling, P.L.R. 8229010, is equally without merit. Private letter rulings have no precedential value. Sec. 6110(b)(1) and (j)(3). In addition the cited private letter ruling does not state, as petitioners imply, that the extension in that case was void ab initio merely because of taxpayer's misleading statements. Instead the private letter ruling states that the extension was void ab initio because, under the circumstances of the case, the IRS District Director or Service Center Director was not empowered to grant an extension. Finally, we must consider petitioners' argument that the waiver of the statute of limitations on the Forms 872-A was ineffective at the date of execution because no settlement negotiations were possible at the date of execution. Petitioners rely on the Seventh Circuit decision in Borg-Warner Corp. v. Commissioner,660 F.2d 324 (7th Cir. 1981). In Borg-Warner the taxpayer executed a Form 872-A on July 18, 1974. The agreement which the taxpayer executed specifically provided the agreement could be terminated on "mailing by the Internal Revenue Service of written notification to the taxpayer(s) of termination *150 of Appellate Division consideration." Borg-Warner Corp. v. Commissioner,supra at 325. After discussions with the taxpayer's representatives, one of the Appellate Division conferees wrote to inform the taxpayer's representatives that no mutually satisfactory basis for closing the case had been reached and that they intended to recommend issuance of a notice of deficiency. Borg-Warner Corp. v. Commissioner,supra at 326. The Court determined that the letter from the Appellate Division conferee constituted notification of termination. Borg-Warner Corp. v. Commissioner,supra at 332. The Court did not hold that termination of Appellate Division consideration per se vitiated the consent as petitioners maintain. After the execution of the consent in issue in Borg-Warner, the IRS issued Rev. Proc. 79-22, 1979-1 C.B. 563, which provided: 4.02 With the exception of the mailing of a notice of deficiency, written notification by the Service to the taxpayer(s) of termination of Service consideration can only be made using Form 872-T. This language is reflected in all of the Forms 872-A signed by petitioners. Unlike the situation in Borg-Warner the manner in which termination is to occur is *151 unambiguously set out in the Revenue Procedure and in the Forms 872-A. Consequently, petitioners' reliance on Borg-Warner is misplaced, and we do not find that the Forms 872-A were vitiated by the lack of appellate consideration. See Grunwald v. Commissioner,86 T.C. at 90. In accord with our views expressed herein, An appropriate order will be issued.
Footnotes
1. Cases of the following petitioners are consolidated herewith for trial, briefing, and opinion on the severed issues: Edward Hersh and Najla Hersh, docket No. 14157-79; Jeffrey A. Diamond and Maria Diamond, docket No. 14161-79; Bertram J. Frankel and Harriet Frankel, docket No. 14164-79; N. Ralph Frankel and Diane Frankel, docket No. 17504-79; Howard Fuerst and Sheila Fuerst, docket No. 17505-79; Robert Pomerantz and Ellen Pomerantz, docket No. 17543-79; Robert Josell and Selma Josell, docket No. 17544-79; Raymond P. Nolan and Mildred Nolan, docket No. 4338-80; Arthur I. Feinberg and Lois H. Feinberg, docket No. 4340-80; Sam Strum and Lynn Strum, docket No. 6091-80; Charles K. Hepner and Rhoda Hepner, docket No. 7393-80; Arthur S. Rubin and Wendy S. Rubin, docket No. 7394-80; Estate of H. Loy Anderson, Deceased, Bessemer Trust Company of Florida and H. Loy Anderson, Jr., Co-Personal Representatives, and Estate of Therese A. Anderson, Deceased, Andrea A. Hersey, Personal Representative, docket No. 18517-80; Stoyan P. Rosenthal and Tobene M. Rosenthal, docket No. 20687-80; Ted M. Avellone and June Avellone, docket No. 20688-80; Eugene Mascarenhas and Lalita Mascarenhas, docket No. 22197-81; James A. Gillis and Cathy Gillis, docket No. 22204-81; D. Ralph Millard, Jr., and Barbara S. Millard, docket No. 25759-81; N. Ralph Frankel and Diane Frankel, docket No. 25843-81; Richard Leben and Mary L. Leben, docket No. 29103-81.↩
2. These cases were assigned pursuant to sec. 7456(d), Internal Revenue Code of 1954, as amended, and Rule 180, Tax Court Rules of Practice and Procedure.↩
3. Abbey S. Klein, Najla Hersh, Maria Diamond, Harriet Frankel, Diane Frankel, Sheila Fuerst, Ellen Pomerantz, Selma Josell, Mildred Nolan, Lois H. Feinberg, Lynn Strum, Rhoda Hepner, Wendy S. Rubin, Tobene M. Rosenthal, June Avellone, Lalita Mascarenhas, Cathy Gillis, Barbara S. Millard, and Mary L. Leben are parties to this action only by virtue of filing joint Federal income tax returns with their husbands. Consequently, unless otherwise indicated, petitioner or petitioners shall refer to petitioner-husbands only. In addition, in the case of petitioners Estate of H. Loy Anderson, Deceased, Bessemer Trust Company of Florida and H. Loy Anderson, Jr., Co-Personal Representatives, and Estate of Therese A. Anderson, Deceased, Andrea A. Hersey, Personal Representative, petitioner shall refer to the deceased H. Loy Anderson, unless otherwise specified.↩
4. The parties agree that the years affected by the statute of limitations issue are as follows: Rubin Klein and Abbey S. Klein, 1975; Edward Hersh and Najla Hersh, 1975; Jeffrey A. Diamond and Maria Diamond, 1975; Bertram J. Frankel and Harriet Frankel, 1974, 1975; N. Ralph Frankel and Diane Frankel, 1974, 1975, 1977; Howard Fuerst and Sheila Fuerst, 1975; Robert Pomerantz and Ellen Pomerantz, 1975; Robert Josell and Selma Josell, 1975; Raymond P. Nolan and Mildred Nolan, 1975; Arthur I. Feinberg and Lois H. Feinberg, 1975; Sam Strum and Lynn Strum, 1975; Charles K. Hepner and Rhoda Hepner, 1975; Arthur S. Rubin and Wendy S. Rubin, 1975; Estate of H. Loy Anderson, Deceased, Bessemer Trust Company of Florida and H. Loy Anderson, Mr., Co-Personal Representatives, and Estate of Therese A. Anderson, Deceased, Andrea A. Hersey, Personal Representative, 1975; Stoyan P. Rosenthal and Tobene M. Rosenthal, 1975; Ted M. Avellone and June Avellone, 1975, 1976; Eugene Mascarenhas and Lalita Mascarenhas, 1977; James A. Gillis and Cathy Gillis, 1977; D. Ralph Millard, Jr. and Barbara S. Millard, 1976, 1977; Richard Leben and Mary L. Leben, 1977. 5. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue.↩
6. The tax shelter programs initiated at the national level and later initiated at the regional levels are individually and collectively referred to as the "Tax Shelter Program" unless otherwise indicated.↩
7. Manual Supplements designated by the IRS as M.S. were made public as a result of Long v. I.R.S.,349 F.Supp. 871 (W.D.Wash. 1972) and Hawkes v. I.R.S.,467 F.2d 787↩ (6th Cir. 1972). Manual Supplements were disseminated to tax practitioners with their publication by Tax Analysts and Advocates in 1973.
8. Prior to October 1, 1978, appeals consideration was available at the IRS district and regional levels. After that date the Appellate Division of the regional offices was renamed the Appeals Office, and the district level was eliminated. See generally, M. Saltzman, I.R.S. Practice and Procedure, par. 9.02 (1981).
9. The "war room" concept referred to the system of tracking and monitoring all of the cases in the Southeast Region Tax Shelter Program.↩
10. By M.S. 12G-204 dated September 13, 1978 the Audit Division was redesignated the Examination Division, a title which it bears to this date.↩
11. Tax practitioners were notified of this development by an IRS newsletter published in the same month. The newsletter, in part, provided that: In no instance have settlements for more than out-of-pocket expenses ever been offered and this is the best deal investors can expect from IRS.[Emphasis added.] Petitioners' counsel in his Finding of Fact No. 99 provides the following quote of the same material: In no instance have settlements for out-of-pocket expenses ever been offered and this is the best deal investors can expect from IRS. Counsel's recitation of the quoted material is obviously misleading, and we caution counsel that the Court will not tolerate such conduct.↩
12. The 30-day letters stipulated by the parties did contain a copy of the Report Transmittal as an attachment to each 30-day letter. However, the parties agree that the Report Transmittal was not given to the partnerships, and we have disregarded the stipulation and exhibits to the extent that they infer the Report Transmittals were so received.↩
13. Although identified as a case appropriate for litigation in 1977 along with Hollywood, the examination of Emerald was not closed at that time.↩
14. the 30-day letters stipulated by the parties did contain a copy of the Report Transmittals as an attachment to each 30-day letter. However, the parties agree that the Report Transmittals were not given to petitioners, and we have disregarded the stipulation and exhibits to the extent that they infer the Report Transmittals were so received.↩
15. Petitioners do not contend that equitable estoppel is applicable in these cases, although their arguments seemingly raise this issue. Had petitioners raised this issue, we would have rejected the application of equitable estoppel. See Estate of Emerson v. Commissioner,67 T.C. 612↩ (1977).
16. Petitioners cite Walsonavich v. United States,335 F.2d 96↩ (3d Cir. 1964), in support of their argument. Although this case does discuss the mutuality of benefits it does so only in the context of a specific statutory provision which permits the extension of the period for assessment to also extend the period for refund. The case does not articulate a general principle of law that a taxpayer must receive a quid pro quo other than an extension of the refund period when executing a waiver.
17. See, e.g., Ravin v. Commissioner,T.C. Memo. 1981-107, affd. in an unpublished opinion 755 F.2d 936↩ (9th Cir. 1985).
18. While not clear from the record, it appears that respondent had identified nontax shelter issues which would be subject to the normal administrative consideration in some of the cases.↩